UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| PENNY CRENSHAW, <br><br> Plaintiff, <br><br> v. <br><br> FRANK BISIGNANO[1], Commissioner of the Social Security Administration, <br><br> Defendant. | Case No. 3:24-cv-00901 <br><br> Judge Eli J. Richardson <br> Magistrate Judge Alistair E. Newbern |

To: The Honorable Eli J. Richardson, District Judge

### REPORT AND RECOMMENDATION

Plaintiff Penny Crenshaw filed this action under 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of the Social Security Administration (SSA) denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. (Doc. No. 1.) Crenshaw filed a motion for judgment on the administrative record (Doc. No. 17), to which the Commissioner responded in opposition (Doc. No. 21). Crenshaw has filed a reply. (Doc. No. 22.)

The Court has referred this action to the Magistrate Judge to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1)(A) and (B). (Doc. No. 24.)

---

[1] Frank Bisignano was sworn in as Commissioner of Social Security on May 7, 2025. Press Release, Social Security National Press Office, Financial Services Industry Leader Frank Bisignano to be the 18th Commissioner of Social Security (May 7, 2025), https://www.ssa.gov/news/press releases/2025/#2025-05-07 (last visited Aug. 4, 2025). Under Federal Rule of Civil Procedure 25(d), Bisignano is automatically substituted as the defendant in this action. Fed. R. Civ. P. 25(d).

Having considered the parties' arguments and the administrative record (Doc. No. 13) as a whole, and for the reasons that follow, the Magistrate Judge will recommend that the Court grant Crenshaw's motion.

## I. Background

### A. Crenshaw's DIB Application

Crenshaw applied for DIB on June 10, 2020, alleging that she has been disabled and unable to work since April 1, 2019, because of heart disease, diabetes, seizures, shoulder pain, arthritis, degenerative disc disease, headaches, insomnia, atrial fibrillation, and high blood pressure. (AR 72.[2]) The Commissioner denied Crenshaw's application initially and on reconsideration. (AR 70, 98.) At Crenshaw's request, an administrative law judge (ALJ) held a telephonic hearing regarding her application on May 2, 2023. (AR 33–53, 127–28.) Crenshaw appeared with counsel and testified. (AR 35, 37–49.) The ALJ also heard testimony from a vocational expert. (AR 49–52.)

### B. The ALJ's Findings

On June 28, 2023, the ALJ issued a written decision finding that Crenshaw was not disabled within the meaning of the Social Security Act and applicable regulations and denying her claim for DIB. (AR 17–32.) The ALJ made the following enumerated findings:

1. The claimant last met the insured status requirements of the Social Security Act on March 31, 2023.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of April 1, 2019 through her date last insured of March 31, 2023 (20 CFR 404.1571 *et seq.*).

---

[2] The transcript of the administrative record (Doc. No. 13) is referenced herein by the abbreviation "AR." All page numbers cited in the AR refer to the Bates stamp at the bottom right corner of each page.

3. Through the date last insured, the claimant had the following severe impairments: ischemic heart disease, epilepsy, diabetes mellitus, spine disorder, and obesity (20 CFR 404.1520(c)).

\* \* \*

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

\* \* \*

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a range of medium work as defined in 20 CFR 404.1567(c). The claimant could frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; and frequently stoop, crouch, kneel, crawl, and balance. The claimant could have occasional exposure to extreme heat and extreme cold. The claimant should have avoided all exposure to work around hazardous machinery, moving parts, and work at unprotected heights.

\* \* \*

6. Through the date last insured, the claimant was capable of performing past relevant work as a home attendant (*Dictionary of Occupational Titles* (DOT) #354.377-014) and the composite of a cashier II (#211.462-010) and a salesperson, horticultural and nursery products (#272.357-022). This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

\* \* \*

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from April 1, 2019, the alleged onset date, through March 31, 2023, the date last insured (20 CFR 404.1520(f)).

(AR 19–27.) The Social Security Appeals Council denied Crenshaw's request for review on June 6, 2024, making the ALJ's decision the final decision of the Commissioner. (AR 1–6.)

C. **Appeal Under 42 U.S.C. § 405(g)**

Crenshaw filed this action for review of the ALJ's decision on July 24, 2024 (Doc. No. 1), and the Court has jurisdiction under 42 U.S.C. § 405(g). Crenshaw argues that the ALJ erred in evaluating her testimony about her symptoms because the ALJ found that Crenshaw was not

3

Case 3:24-cv-00901    Document 25    Filed 08/07/25    Page 3 of 15 PageID #: 734

receiving significant ongoing medical treatment without considering possible reasons why Crenshaw was not receiving such treatment. (Doc. No. 17.) Crenshaw also argues that the ALJ erred by failing to include limitations for her shoulder pain in the residual functional capacity and by improperly evaluating medical opinion evidence from consulting physician Carol Cistola, M.D. (*Id.*) The Commissioner responds that the ALJ followed applicable SSA regulations and that the ALJ's determinations are supported by substantial record evidence. (Doc. No. 21.) Crenshaw's reply reiterates her principal arguments. (Doc. No. 22.)

### D. Review of the Record

The ALJ and the parties have thoroughly described and discussed the medical and testimonial evidence in the administrative record. Accordingly, the Court will discuss those matters only to the extent necessary to address the parties' arguments.

## II. Legal Standards

### A. Standard of Review

This Court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings are supported by substantial evidence and (2) whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (alteration in original) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is less than a preponderance but "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 103 (quoting *Consol. Edison Co.*, 305 U.S. at 229); *see also Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (same). Further, "[t]he Social Security

Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Gentry*, 741 F.3d at 723. Where an ALJ fails to follow those rules or regulations, "we find a lack of substantial evidence, 'even where the conclusion of the ALJ may be justified based upon the record.'" *Miller*, 811 F.3d at 833 (quoting *Gentry*, 741 F.3d at 722).

### B. Determining Disability at the Administrative Level

Crenshaw applied for DIB under Title II of the Social Security Act, which is an insurance program that "provides old-age, survivor, and disability benefits to insured individuals irrespective of financial need." *Bowen v. Galbreath*, 485 U.S. 74, 75 (1988). To receive DIB, Crenshaw must establish that she had a disability on or before the last date she was eligible for insurance under Title II, which is determined based on her earnings record. *See* 42 U.S.C. § 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.130. "Disability" in this context is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

ALJs must employ a "five-step sequential evaluation process" to determine whether a claimant is disabled, proceeding through each step until a determination can be reached. 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ considers the claimant's work activity. *Id.* § 404.1520(a)(4)(i). "[I]f the claimant is performing substantial gainful activity, then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step two, the ALJ determines whether the claimant suffers from "a severe medically determinable physical or mental impairment" or "combination of impairments" that meets the 12-month durational requirement. 20 C.F.R. § 404.1520(a)(4)(ii). "If the claimant does not have a severe impairment or combination of impairments [that meets the durational requirement], then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step

5

three, the ALJ considers whether the claimant's medical impairment or impairments appear on a list maintained by the SSA that "identifies and defines impairments that are of sufficient severity as to prevent any gainful activity." *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); *see* 20 C.F.R. § 404.1520(a)(4)(iii). "If the claimant's impairment meets or equals one of the listings, then the ALJ will find the claimant disabled." *Miller*, 811 F.3d at 834 n.6. If not, the ALJ proceeds to step four. *Combs*, 459 F.3d at 643; *see also Walker v. Berryhill*, No. 3:16-1231, 2017 WL 6492621, at *3 (M.D. Tenn. Dec. 19, 2017) (explaining that "[a] claimant is not required to show the existence of a listed impairment in order to be found disabled, but such showing results in an automatic finding of disability and ends the inquiry"), *report and recommendation adopted*, 2018 WL 305748 (M.D. Tenn. Jan. 5, 2018).

At step four, the ALJ evaluates the claimant's past relevant work and "'residual functional capacity,' defined as 'the most [the claimant] can still do despite [her] limitations.'" *Combs*, 459 F.3d at 643 (alterations in original) (quoting 20 C.F.R. § 404.1545(a)(1)); *see* 20 C.F.R. § 404.1520(a)(4)(iv). Past work is relevant to this analysis if the claimant performed the work within the past 15 years, the work qualifies as substantial gainful activity, and the work lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 404.1560(b)(1). If the claimant's residual functional capacity (RFC) permits her to perform past relevant work, she is not disabled. *Combs*, 459 F.3d at 643. If a claimant cannot perform past relevant work, the ALJ proceeds to step five and determines whether, "in light of [her] residual functional capacity, age, education, and work experience," a claimant can perform other substantial gainful employment. *Id.* While the claimant bears the burden of proof during the first four steps, at step five the burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*,

6

652 F.3d 646, 651 (6th Cir. 2011). "Claimants who can perform such work are not disabled." *Combs*, 459 F.3d at 643; *see also* 20 C.F.R. § 404.1520(a)(4)(v).

## III. Analysis

The ALJ found that Crenshaw has severe medically determinable physical impairments of "ischemic heart disease, epilepsy, diabetes mellitus, spine disorder, and obesity" and nonsevere impairments including "hypertension and hyperlipidemia[.]" (AR 20.) At step four, the ALJ found that these impairments "could reasonably have been expected to cause [Crenshaw's] alleged symptoms[,]" but that Crenshaw's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence found in the record . . . ." (AR 22.) Specifically, the ALJ found that:

> [Crenshaw] alleges they have been disabled due to heart disease, hypertension, diabetes mellitus, a seizure disorder, degenerative disc disease, arthritis, a history of a gastrointestinal ulcer, obesity, depression, and anxiety. More specifically, [Crenshaw] alleges that they get tired quickly and have no energy. [Crenshaw] alleges they also experience headaches, chest pain, and shortness of breath as well. Furthermore, [Crenshaw] alleges they experience pain all over their body, especially involving their back, left shoulder, left arm, left knee, and left ankle. [Crenshaw] alleges their pain is constant and it is typically a six or seven on a scale of zero to ten, with a zero being no pain and a ten requiring emergent medical care. [Crenshaw] further alleges their legs get weak and their left knee and left ankle will swell too. Moreover, [Crenshaw] alleges they experience grand mal seizures when stressed and they feel horrible, have a headache, and need to sleep for several hours following a seizure. In addition, [Crenshaw] also alleges they experience abdominal pain, crying spells, and insomnia as well. As a result, [Crenshaw] alleges they have significant difficulty sitting, standing, walking, lifting, pushing, pulling, climbing stairs, remembering, completing tasks, handling stress, and sleeping. Most notably, [Crenshaw] testified at the hearing that they can sit for no more than thirty minutes at one time, they can walk for no more than fifteen minutes at one time, they can also stand for no more than fifteen minutes at one time, and they can lift and carry no more than twenty-five pounds (See Exs[.] 2E, 4E, 5E, and 7E–9E and Testimony).
>
> After careful consideration of the evidence, the undersigned finds that [Crenshaw]'s medically determinable impairments could reasonably have been expected to cause the alleged symptoms; however, [Crenshaw]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not

entirely consistent with the medical evidence and other evidence found in the record for the reasons explained in this decision.

The record shows [Crenshaw] has a medical history of coronary artery disease, hypertension, diabetes mellitus, seizures, and hyperlipidemia (See Exs. 1F–3F, 7F–9F, 11F, and 13F). Most notably, the record shows [Crenshaw] previously underwent a coronary artery bypass graft sometime in July or August of 2016, if not 2006 (See Exs. 1F, 5F, 6F, and 12F).

More recently, the record shows a consultative physical examination conducted on February 24, 2021 revealed a paraspinal muscle spasm with palpitation of [Crenshaw]'s thoracolumbar spine and accompanying x-rays revealed degenerative changes to their lumbar spine (Ex. 5F). In addition, the record also shows another consultative physical examination subsequently conducted on August 10, 2022 revealed [Crenshaw] was unstable while heel, toe, and tandem walking (Ex. 12F).

However, asides [*sic*] from laboratory testing yielding some abnormal results, namely elevated serum glucose levels and lipid panels, the record does not document diagnostic evidence of any other significant physical pathology, let alone any that would have been expected to produce more than minimal functional limitation for a period of 12-consecutive months from the alleged onset date through the date last insured ("Normal Myocardial Perfusion study with no inducible ischemia", "The calculated left ventricular ejection fraction post stress is 90%", "Her left shoulder x-ray was normal", etc.) (See Exs. 1F, p. 15; 2F, p. 9, 13–14, 16, 18, 22, 26–28, and 31; 5F, p. 4–5; 8F, p. 29; 9F, p. 18; and 13F, p. 21–22). Not to mention, the record shows the severity of the degenerative changes to [Crenshaw]'s lumbar spine present on the x-rays taken on February 24, 2021 were no more than mild as well ("There was slight posterior narrowing at T12–L1, L4–L5 and L5–S1 and remaining disc spaces were well maintained throughout and the visualized pedicles, spinous processes, and para spinous soft tissues were otherwise unremarkable", etc.) (Ex. 5F, p. 4).

More importantly, the record certainly does not document any ongoing objective clinical manifestations of degenerative disc disease, coronary artery disease, or any other significant physical pathology, let alone any that would have been expected to produce more than minimal functional limitation for a period of 12-consecutive months from the alleged onset date through the date last insured ("Regular rate and rhythm", "No murmurs, rubs or gallops", "Nonlabored breathing", "No respiratory distress", "Clear to auscultation bilaterally", "No crackles, wheezes or rhonchi", "Normal inspection, normal range of motion", "The back appears normal and is non-tender to palpation, there is no CVA tenderness", "Visual overview of all four extremities is normal", "Moves all extremities equally", "Full range of motion", "No swelling", "No deformity", "Neurologic intact", "Sensory function intact", etc.) (See Exs. 1F, p. 10 and 13; 2F, p. 8, 12, 16, 18, 21–22, 25, 30, and 34; 5F, p. 3–4; 8F, p. 12–13, 19–20, 27, 34, 40–41, 50, and 67; 9F, p. 15, 20–21, 28, and 34; 11F, p. 6, 17, and 23; 12F, p. 3–5; and 13F, p. 9).

In fact, asides [*sic*] from a slightly elevated blood pressure reading during the first consultative physical examination, the record shows the consultative physical examinations conducted on February 24, 2021 and August 10, 2022 were otherwise unremarkable, including a normal gait, normal range of motion, and normal muscle strength throughout on both ("Her cardiac and pulmonary exams were unremarkable today", "Breath sounds are equal bilaterally without rales, rhonchi or wheezes", "S1 and S2 were normal, No S3 or murmur, no gallops, clicks or rubs", "No clubbing or cyanosis", "ROM testing of the spine was performed and showed she was able to flex and extend full motion", "Her SLRs were normal", "With dorsiflexion of her feet, she did not complain of any pain", "She shows no evidence of para spinal muscle spasm to palpitation in lumbar or thoracic and there was no evidence of scoliosis on exam", "Her muscle bulk and tone were normal", "[Crenshaw] showed FROM in all joints", "No evidence of any joint redness, swelling, heat or deformity", "There was no pedal edema", "She could perform fine manipulation and gross dexterous movements with her hands", "[Crenshaw]'s gait is normal, and she is stable at station", "She was able to get out of chair and on and off table without difficulty", "She was observed putting her shoes on and off", "Muscle strength testing is 5/5 in all major muscle groups", "She was able to walk on her tip toes and heels and tandem walk", "She was able to squat and Rhomberg test were negative bilaterally", "There were no pathological reflexes", "Sensations were normal for upper and lower extremities", "She was able to make a tight fist with each hand and her grip strength rates 5/5 bilaterally", etc.) (Exs. 5F, p. 3–5 and 12F, p. 3–5).

The record also shows [Crenshaw]'s blood pressure was regularly, if not routinely, within normal limits, including during the second consultative physical examination conducted on August 10, 2022, as well ("Blood pressure 118/78", "BP 120/78", etc.) (See Exs. 1F, p. 10 and 13; 2F, p. 7, 11, 15, 17, 20, 24, and 29; 3F, p. 40; 7F, p. 19; 8F, p. 19, 26, 34, 40, and 52; 9F, p. 34; 11F, p. 6, 11, 17, and 22; 12F, p. 3; and 13F, p. 9).

Maybe most telling, asides from the use of medication and four total visits to the emergency department from May 11, 2019 to May 11, 2021, all of which were for the purposes of treating acute medical conditions, such as a tick bite, the record otherwise does not appear to show [Crenshaw] receiving any significant or ongoing medical treatment, certainly not from the alleged onset date through the date last insured ("59-year-old female . . . presents to the emergency department with complaints of an intensely pruritic rash to her bilateral upper and lower extremities, upper trunk, and face that began approximately 6–7 days ago after working in her garden", "This 60 year old female presents for Med refills", "This 61 year old female presents for Med Refills", "Requesting refill of meds doing well", "She denied having diabetic complication with eye, kidney or feet or hands", "There are no associated symptoms", "Pertinent negatives include chest pain, diaphoresis, dyspnea, fatigue, headache, irregular heartbeat/palpitations, nausea and visual disturbances", "Denies: Shortness of breath", "She had no back surgery, no physical therapy or injections", "She denied having any back pains", "Associated symptoms do not include weakness in the arm or paresthesias", etc.) (See Exs. 2F,

9

p. 7, 11, 15, 17, 20, and 24; 3F, p. 4–5, 11, 13, 18, 24–25, 31, 34, 37, and 39; 5F, p. 2–3; 7F, p. 2, 4, 11-12, 16, 19, 25, 27, and 31–32; 8F, p. 10, 14, 17, 25, 32–33, 38-39, 47, 65, and 69; 9F, p. 10, 13–14, 18, 20, 32, and 34; 11F, p. 4, 6, 11–12, 15, 18–19, and 22–24; 12F, p. 2–3; and 13F, p. 3–4, 6, 9–11, 13, 15, 18, 23–24, and 26–27).

In fact, the record shows [Crenshaw]'s coronary artery disease, hypertension, diabetes mellitus, seizure disorder, and hyperlipidemia appear to be well controlled, if not asymptomatic ("Blood pressure is adequately controlled", "Rechecked and controlled", "Controlled", "Pt notes she told last month by her PCP that she is very well controlled but does not know her A1C", "Diabetes and Hypertension are being treated with medications and are controlled", "Keppra levels were not therapeutic, taking meds daily, denies recent seizure", "Reports she has been seizure free for several years", etc.) (See Exs. 1F, p. 10 and 13; 2F, p. 6, 8–9, and 14; 3F, p. 18, 40–41; 5F, p. 5; 7F, p. 16; 9F, p. 15, 30, and 35–36; 11F, p. 18–19 and 23–24; 12F, p. 5; and 13F, p. 13, 21, and 24). The record also shows [Crenshaw] did not report taking any pain relievers in Disability Reports completed on both September 25, 2020 and April 6, 2021 and they frequently denied experiencing any pain as well ("Pain Level: 0/10", etc.) (See Exs. 2E, p. 5; 5E, p. 5; 2F, p. 7; 7F, p. 27; 11F, p. 6, 12, and 24; and 13F, p. 4 and 27).

Nevertheless, the undersigned will weigh the evidence above in [Crenshaw]'s favor and reduce their residual functional capacity accordingly. . . .

(AR 22–25 (footnote omitted).)

Crenshaw argues that this portion of the ALJ's analysis violates Social Security Ruling 16-3p, which "do[es] not allow drawing an adverse inference from Crenshaw's failure to seek additional treatment without consideration that a person 'may not be able to afford treatment and may not have access to free or low-cost medical services.'" (Doc. No. 17, PageID# 695 (quoting SSR 16-3p, 2016 WL 1119029, at *9 (Mar. 16, 2016)).) Specifically, Crenshaw argues that the ALJ failed to consider evidence that Crenshaw did not have health insurance and primarily used free or low-cost medical services. (Doc. No. 17.) The Commissioner responds that Crenshaw's "argument undermines itself" because her admission that "she received treatment through free/low-cost clinics" shows that she "had access to medical treatment." (Doc. No. 21, PageID# 718.) The Commissioner argues that "there is no indication that [Crenshaw] was ever denied medical treatment because of an inability to afford treatment." (*Id.* at PageID# 719.) And

the Commissioner argues that, because the ALJ stated that he "'nevertheless' [ ] weighed the evidence in [Crenshaw's] 'favor and reduce[d]' the RFC . . . , the ALJ did not hold [Crenshaw's failure to seek additional treatment] against [her]." (*Id.* (third alteration in original).) Crenshaw replies "that free clinic treatment, while very helpful to individuals without insurance, is not the same as that accessible to an insured individual" and argues that the Commissioner's "post hoc rationale suggesting that the ALJ considered Crenshaw's financial constraints in obtaining additional treatment" is "unsupported by the ALJ's decision." (Doc. No. 22, PageID# 727.)

Section 404.1529(c)(3) allows an ALJ to consider a DIB claimant's current and past medications and treatment in evaluating the claimant's symptoms, including pain. 20 C.F.R. § 404.1529(c)(3)(iv), (v). The SSA has explained that, "if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms," then the SSA "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." SSR 16-3p, 2016 WL 1119029, at *8. However, the SSA has promised claimants that it "will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." *Id.* One example of such reasons includes the fact that "[a]n individual may not be able to afford treatment and may not have access to free or low-cost medical services." *Id.* at *9. The SSA has further promised that it "will consider and address reasons for not pursuing treatment that are pertinent to an individual's case" and "will explain how [it] considered the individual's reasons in [its] evaluation of the individual's symptoms." *Id.*

There is no dispute that, in evaluating Crenshaw's symptoms, the ALJ stated that the evidence he found to be "[m]aybe most telling" was that,

> aside[ ] from the use of medication and four visits to the emergency department from May 11, 2019[,] to May 11, 2021, all of which were for the purposes of treating acute medical conditions, such as a tick bite, the record otherwise does not appear to show the claimant receiving any significant or ongoing medical treatment, certainly not from the alleged onset date through the date last insured . . . .

(AR 24.) Crenshaw argues that the ALJ violated SSR 16-3p by failing to consider and address the possible reasons why Crenshaw was not receiving further medical treatment, including her lack of health insurance and limited financial resources. (Doc. No. 17.) Specifically, Crenshaw points to record evidence that she was uninsured during the relevant period and that the medical treatment she did receive was primarily through emergency rooms and free or low-cost clinics. (*Id.* (citing AR 335–411, 428–461, 470, 477, 485, 525, 532–68, 578–602).) Crenshaw also points to record evidence that she informed the SSA that she did "'not have health insurance'" and was therefore "'unable to get the necessary medical treatment that [she] need[ed].'" (*Id.* (quoting AR 256).)

The ALJ's written opinion draw conclusions against Crenshaw for only seeking medical treatment for "acute medical conditions" (AR 24), but the ALJ did not mention Crenshaw's uninsured status and "never discussed how [Crenshaw's] lack of insurance impacted [the ALJ's] findings regarding [Crenshaw's] treatment." *Moore v. Comm'r of Soc. Sec.*, No. 1:14-CV-375, 2015 WL 5682322, at *4 (W.D. Mich. Sep. 25, 2015). Indeed, "[t]here is no mention in the ALJ's decision as to whether he considered *any* reasons for why" Crenshaw did not receive more significant or ongoing medical treatment other than his conclusion that her disabling conditions did not warrant it. *Huffman v. Saul*, Civ. Action No. 5:19-cv-449, 2020 WL 6937441, at *6 (E.D. Ky. Nov. 24, 2020).

The Commissioner has not argued that that the ALJ considered Crenshaw's lack of medical insurance, financial hardship, or other possible reasons for not obtaining regular medical treatment.

Instead, the Commissioner argues that the ALJ did not draw an adverse inference against Crenshaw based on her lack or treatment because the ALJ stated that he nevertheless weighed the evidence in Crenshaw's favor. (Doc. No. 21 (quoting AR 25).) The Commissioner's argument is not supported by the record.

The ALJ's written decision includes ten paragraphs discussing whether Crenshaw's medically determinable physical impairments could reasonably have been expected to cause her alleged symptoms and whether Crenshaw's testimony about her symptoms was consistent with the record evidence. (AR 22–25.) The ALJ expressly stated that, of the evidence he considered, "[m]aybe [the] most telling" was that,

> aside[ ] from the use of medication and four total visits to the emergency department . . . for the purposes of treating acute medical conditions, such as a tick bite, the record otherwise does not appear to show [Crenshaw] receiving any significant or ongoing medical treatment, certainly not from the alleged onset date through the date last insured.

(AR 24.) Thus, the ALJ found that "the frequency or extent of the treatment sought by [Crenshaw] [was] not comparable with the degree of [her] subjective complaints[.]" SSR 16-3p, 2016 WL 1119029, at *8. Contrary to the Commissioner's argument, the ALJ's general statement that he "[n]evertheless" weighed the evidence "in [Crenshaw's] favor" does not negate the ALJ's specific finding that Crenshaw did not receive medical treatment consistent with the alleged severity of her symptoms.

The Commissioner's argument that Crenshaw "had access to medical treatment" because she admits that "she received treatment through free/low-cost clinics" (Doc. No. 21, PageID# 718), The Commissioner has not identified any evidence in the record to support a finding that the free or low-cost clinics Crenshaw sometimes visited could have provided her with the type of "significant or ongoing medical treatment" the ALJ would have found to support her alleged

13

Case 3:24-cv-00901    Document 25    Filed 08/07/25    Page 13 of 15 PageID #: 744

symptoms (AR 24). Even if there were such evidence in the record, there is no indication that the ALJ considered it or the possibility of that explanation in reaching his decision.

On this record, the Court cannot find that the ALJ followed SSA rules and regulations requiring him to consider and address Crenshaw's reasons for not pursuing further treatment and to explain that consideration in his written decision. *See* SSR 16-3p, 2016 WL 1119029, at *9. Where, as here, "an ALJ fails to follow agency rules and regulations, we find a lack of substantial evidence, 'even where the conclusion of the ALJ may be justified based upon the record.'" *Miller*, 811 F.3d at 833 (quoting *Gentry*, 741, F.3d at 722). Remand is therefore warranted for reconsideration of possible reasons why Crenshaw did not pursue further medical treatment. *See, e.g., Broersma v. Comm'r of Soc. Sec.*, Case No. 1:22-cv-327, 2023 WL 6157191, at *4–7, *8 (W.D. Mich. Sep. 21, 2023) (remanding for reconsideration where ALJ improperly "drew a negative inference from plaintiff's failure to seek out medical treatment without adequately considering her inability to afford such treatment since her husband lost medical insurance . . ."); *Moore*, 2015 WL 5682322, at *4–5, *6 (remanding for reconsideration where "ALJ drew inferences from Plaintiff's failure to pursue physical therapy without considering whether he was unable to afford such treatment"); *Wyrich v. Soc. Sec. Admin.*, Case No. 3:20-cv-00682, 2022 WL 526488, at *6 (M.D. Tenn. Feb. 22, 2022) (recommending remand "for reconsideration of possible reasons why [claimant] did not pursue treatment for his back pain" including "poverty, depression, and alcoholism").

Because remand is warranted on this ground, and because reconsideration of Crenshaw's reasons for not pursuing treatment may also require reconsideration of the limiting effects of Crenshaw's shoulder pain and Dr. Cistola's opinions regarding the limiting effects of Crenshaw's symptoms, the Court does not need to address Crenshaw's remaining arguments regarding the

ALJ's failure to include limitations for Crenshaw's shoulder pain in the RFC and the ALJ's consideration of Dr. Cistola's opinions. *See Wyrich*, 2022 WL 526488, at *6 (collecting authority). If necessary, Crenshaw may raise these issues again on appeal. *See id.*

## IV. Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that Crenshaw's motion for judgment on the administrative record (Doc. No. 17) be GRANTED, that the Commissioner's final decision be VACATED, and that this matter be REMANDED to the Social Security Administration for further administrative proceedings consistent with this Report and Recommendation.

The Clerk of Court is DIRECTED to change the caption of this case to reflect that Social Security Commissioner Frank Bisignano is the defendant.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 7th day of August, 2025.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge